Attorneys for Plaintiff
Securities and Exchange Commission
Edward J. Reilly, Senior Trial Counsel (admitted *pro hac vice*)
Derek Bentsen, Senior Trial Counsel (admitted *pro hac vice*)
Ada Fernandez Johnson, Senior Counsel (admitted *pro hac vice*)
Katherine H. Stella, Senior Counsel (admitted *pro hac vice*)
100 F Street NE
Washington DC 20549
Telephone: (202) 551-6791 (Reilly)
Facsimile: (202) 551-9287

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    vs.<br><br>MARKMAN BIOLOGICS CORP. and ALAN SHINDERMAN,<br><br>        Defendants,<br><br>        *and*<br><br>ASPEN ASSET MANAGEMENT SERVICES, LLC<br><br>        Relief Defendant. | Case No. 2:23-cv-288-APG-DJA |

## JOINT PRETRIAL ORDER

After pretrial proceedings in this case,

IT IS ORDERED:

1

## I.

### A.  NATURE OF THE ACTION

#### Plaintiff's Statement on the Nature of the Action

This is a civil enforcement action brought by the Securities and Exchange Commission against Defendant Alan Shinderman and Relief Defendant Aspen Asset Management Services, LLC ("Aspen"), alleging violations of the anti-fraud provisions of the federal securities laws. The SEC alleges that from November 2019 to July 2023, Shinderman conducted four fraudulent, unregistered securities offerings, raising approximately $1.4 million from at least 69 investors. The SEC further alleges that Shinderman made material misrepresentations to investors regarding executive compensation, related party transactions, and use of investor funds. And the SEC alleges that Shinderman engaged in a scheme to defraud investors by misappropriating more than $600,000 representing over 40% of all funds raised from investors, for his personal expenses and for his wholly-owned company, Relief Defendant Aspen. Additionally, the SEC understands that Shinderman in his responses below purports to defend both himself and Aspen. The SEC objects to any efforts by Shinderman to defend Aspen, which, as a corporate entity, must be represented by counsel. *Reading Intern., Inc. v. Malulani Group, Ltd.*, 814 F.3d 1046, 1053 (9th Cir. 2016) (explaining that corporations must be represented by counsel). To the extent the SEC refers to "Defendants" below for the convenience of the Court in addressing the arguments that Shinderman purports to raise on behalf of himself and Aspen, we do not waive this continuing objection.

#### DEFENDANTS ADD:

Defendant Alan Shinderman and relief defendant Aspen [herein collectively as "Defendants"] see the matter differently than does the SEC.  To summarize, Defendants claim and are prepared to submit evidence, testimony and argument that the entirety of the funds raised by the investment[s] made into MBC were deposited anlogside monies loaned to MBC by Mr. Shinderman and then deployed and expended legitimately, reasonably and legally in promoting and advancing MBC's success.  Further, the Defendants will dispel the notion that they were engaged in some sort of scheme to steal money from MBC a few dollars at a time or otherwise.  To the contrary, the evidence will show that the expenditures, for example, for the CEO's salary were known to the promoters and the

board of MBC, and will also show that Mr. Shinderman did not take his full salary when deposited funds were not sufficient. The payments to Aspen for services necessary to place MBC in a position to go public were also reasonable, began before Mr. Shinderman took the helm, and were done out in the open even as the scope of those services expanded with Dr. and Mrs. Markman's blessing. Similarly, the very reasonable rent that MBC paid to Aspen for its part of the Las Vegas-based office suite that MBC needed started at only $1,000 monthly. Finally, the sundry expenditures that the SEC wants to claim were for personal expenses were either not properly so characterized because they were legitimate business expenditures and the remaining expenditures were booked properly in MBC's company books as advances to Mr. Shinderman against unpaid portions of his salary and the like. It is Defendants position that any discrepancy or potentially misleading statement in anything filed with the SEC or shown to investors was not material to any decision to invest. Under the federal securities laws, only misrepresentations or omissions of material fact are actionable and a fact is material only if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus. v. Northway, 426 U.S. 438, 449 (1976)*; *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27 (2011)*; *Basic Inc. v. Levinson, 485 U.S. 224, 232 (1988)*. MBC was grown and became a viable and successful entity under Shinderman's guidance and through his efforts. No investor has suffered any pecuniary loss of any kind by investing in MBC. The challenged expenditures of salary, rent and fees for services stand alongside all of the unchallenged expenditures for patent lawyers, medical clinical trials, insurance, and all the other expenses that any start-up bio-tech firm would experience and Defendants will prove that the former were just as legitimate as the latter. Defendants will show the factfinder that it was Dr. and Mrs. Markman along with several MBC shareholders who were the ones to actually and truly loot MBC of its most valuable asset: the U.S. Patents that have been clawed-back from MBC and are now possessed by the Markman's "new" venture: CellTherX Corporation. Also, the second-most valuable asset held by MBC at the time of Mr. Shinderman's departure as CEO has also found its way onto the balance sheet of CellTherX Corp. this being the reciveables, etc. from the agreement Shinderman brokered and finalized between MBC and Osteogenics for worldwide licensed manufacture sale of MBC's product to the dental and oral surgery market. Thus, the position held by

3

the Defendants that Dr. Markman and his allies have in fact used the SEC's investigation and the innocuous conduct of Shinderman as a pretext to their actual, provable looting of the company.  In sum, Mr. Shinderman grew MBC into something valuable and then Dr. Markman gutted it and started another one with the two main assets MBC once owned.

## B.  THE PARTIES

### Plaintiff's Statement on the Parties

**Plaintiff**

The SEC is a federal agency charged with enforcing the federal securities laws to protect investors and maintain fair and orderly markets.

**Defendant**

Alan Shinderman, age 72, is a resident of Frisco, Texas and who earlier resided in Las Vegas, Nevada. From December 2017 to July 2023, Shinderman was the President, Chief Executive Officer, Secretary, and Treasurer of Markman Biologics Corp., where he was also a member of its Board of Directors. Shinderman simultaneously solely-owned and operated Aspen, which he founded in or around 1995. Shinderman was previously enjoined by this Court from committing future violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") in *SEC v. Quicksilver Stock Transfer LLC and Alan Shinderman*, Case No. 2:18-cv-00131 (the "Quicksilver Action").

**Relief Defendant**

Aspen is a Nevada Commercial Registered Agent, which provides corporate development services for public and private companies, and is solely-owned by Shinderman. During the relevant period (November 2019 through July 2023), Aspen's principal place of business was in Las Vegas, Nevada.

**Other Relevant Entity**

Former Defendant Markman Biologics Corp. ("Markman Biologics") is a private Nevada State corporation. Its principal place of business was Las Vegas, Nevada, for most of the relevant time period. At the time the SEC filed the Complaint in this action, Markman Biologics' principal place of business was in Dallas, Texas. During the relevant period, Markman Biologics held patents regarding micro-surfacing skin grafts and was working to commercialize this medical technology. On January

31, 2024, with Markman Biologics' stipulated consent, this Court issued a final judgment as to Markman Biologics and it is no longer a party to this action.

**DEFENDANTS' RE: PARTIES**

Defendants agree with and adopt the general description of the Parties. And Mr. Shinderman did not become president or CEO of MBC in 2017, but this did occur later on. Defendants would add, however, that former named party defendant MBC and its promoters, Dr. Barry and Mrs. Judith Markman, are husband and wife and that they had a financial interest in seeing MBC fail, such that Dr. Markman would then be able to claw-back his assigned patents from MBC and go start a new corporation that could utilize those same or very similar U.S. Patents to compete against MBC OR INDEED SUPPLANT ITS POSITION IN THE MARKETPLACE , all of which has in fact occurred since 2023; the proof of such is embodied in the advent and advancement of CellTherX Inc., a Texas for-profit corporation, which is the new company the Markmans went off to start with the intellectual property and the lucrative exclusive worldwide licensing agreement with Osteogenics that is discussed elsewhere in this document.

## C. KEY PROCEDURAL HISTORY

### Plaintiff's Statement on Key Procedural History

On February 23, 2023, the SEC filed this action against Defendant Alan Shinderman, Relief Defendant Aspen, and Former Defendant Markman Biologics. Docket Entry ("DE") 1. On January 31, 2024, the Court entered a final judgment as to Markman Biologics. DE 39. On May 15, 2025, the SEC filed a motion for summary judgment against Alan Shinderman and Aspen for conducting an unregistered offering in violation of Section 5 of the Securities Act of 1933 ("Securities Act") and engaging in securities fraud in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. DE 99.

On December 19, 2025, the Court ruled on the SEC's motion for summary judgment, granting the SEC's motion as to the unregistered securities offering claim under Section 5 and granting the SEC's motion for most of the elements of its fraud claims. DE 113 ("MSJ Opinion or Op."). Regarding the SEC's claims that Shinderman made materially fraudulent statements, the Court found that Shinderman made false and misleading representations and omissions by (1) lying about his

compensation; (2) deceiving investors about his interest in Aspen and the Markman Biologics investor funds Aspen received; and (3) making positive statements about his professional experience while omitting facts that were necessary to make those statements not misleading, namely the Quicksilver Action. The Court also found that Shinderman acted with scienter in making these false and misleading representations and omissions. However, the Court found that Shinderman raised a question of fact as to whether these misrepresentations were material.  In addition, the Court found that Shinderman engaged in a scheme to defraud, by means of interstate commerce, acting with the requisite intent. However, the Court found that there was a dispute of fact regarding whether the scheme to defraud was in connection with the purchase or sale of a security. The Court also declined, in deciding the motion for summary judgment, to find that Aspen received ill-gotten gains.

Accordingly, and per the Court's order, the only remaining triable issues for the fraud claims are whether: (1) Shinderman's misrepresentations and omissions, made with scienter, were material, and (2) Shinderman's intentional scheme to defraud was in connection with the purchase or sale of a security.

**Defendants' Statement on Key Procedural History**

Defendants agree for the most part to those of SEC's recitation of the matter's bare procedural history that are borne out within the case record.  The Court's partial summary judgment ruling [ECF No. 113] speaks for itself as to procedural ruling[s].  The issue of materiality is denied by Defendants. The question/issue of relation to securities offer and purchase are denied. Further, Defendants are firmly of the position that no reasonable investor would be affected by what the SEC claims was fraud and consequently also that no investor has suffered any financial harm by investing in MBC.

**D. RELIEF SOUGHT**

**Plaintiff's Statement on Relief Sought**

The SEC seeks the following relief, all of which is to be decided by the Court following the jury's verdict:

   a. Permanent injunctions enjoining Shinderman from violating, or committing future violations of, Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

6

b. Conduct-Based Injunctions permanently enjoining Shinderman from (1) directly or indirectly, including, but not limited to, through any entity owned or controlled by Shinderman, participating in the issuance, purchase, offer, or sale of any security, except for any transaction from his personal brokerage account, and (2) participating in the management, administration, supervision of, or otherwise exercising any control over, any commercial enterprise or project that issues, purchases, or sells securities;

c. An Officer and Director Bar permanently enjoining Shinderman from serving as an officer or director of any public company pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act;

d. A Penny Stock Bar permanently prohibiting Shinderman from participating in an offering of a penny stock pursuant to Section 20(g) of the Securities Act and Section 21(d) of the Exchange Act;

e. Disgorgement of ill-gotten gains with prejudgment interest from Shinderman;

f. Disgorgement of ill-gotten gains with prejudgment interest from Relief Defendant Aspen on a joint and several basis with Shinderman;

g. Civil penalties from Shinderman; and

Such other and further relief as the Court deems just and necessary.

**Defendants' Statement on Relief Sought:**

For the record, Defendants are not pursuing affirmative claims, counterclaims or cross-claims of any kind in this civil action.  The Defendants seek verdict in their favor at the jury trial the Court has or will later set in this matter. Defendants agree with the SEC that the jury trial will not task the factfinder with assessing anything beyond up or down decisions on the limited trial issues. Defendant reserves for trial the right to submit proposed jury questions on that issue for the Court's consideration.  Defendants reserve a future claim for fees and costs and other relief under Section 2412(b) of the Equal Access to Justice Act and otherwise.[1]

---

[1] See, *Rodriguez v. United States*, 542 F.3d 704, 709 (9th Cir. 2008); Costs recoverable under the EAJA are enumerated in 28 U.S.C. § 1920.

**E.  CONTENTIONS OF THE PARTIES**

**Contentions of the SEC**

The SEC contends that Shinderman violated Securities Act Section 17(a), Exchange Act Section 10(b), and Exchange Act Rule 10b-5 thereunder by making materially false and misleading statements to investors and engaging in a fraudulent scheme through which he misappropriated more than $600,000—or over 40%—of Markman Biologics' investors' funds.

**Materially False and Misleading Statements**

Specifically, the SEC contends, and the Court found, that Shinderman repeatedly made false and misleading statements about three key matters, all of which the SEC contends were material to a reasonable investor. First, Shinderman made false statements about his personal compensation, falsely stating in offering materials and Forms D that "no compensation has been paid" and telling at least one investor he would not take "one dime" of investor funds. In truth, Shinderman actually paid himself approximately $230,000 in salary, used more than $104,000 for personal expenses, and withdrew over $32,000 in unexplained cash. In addition, Mr. Shinderman received at least 600,000 shares of Markman Biologics. Second, Shinderman made false statements about related party transactions, claiming in offering materials that Markman Biologics had not entered into any such transactions. In truth, Shinderman caused Markman Biologics to engage in numerous related party transactions by making over 39 payments totaling approximately $233,000 to, or for the benefit of, Relief Defendant Aspen (Shinderman's wholly-owned company). Third, Shinderman made false statements, and omitted statements that were necessary to make his statements not misleading, about his professional background. Shinderman touted his "long and successful career" and expertise with over 120 companies—most of which were clients of Quicksilver Stock Transfer LLC. But Shinderman omitted that he had recently been enjoined by a federal court from committing further violations of the antifraud provisions of the federal securities in the Quicksilver Action, where the SEC alleged he fraudulently misappropriated approximately $630,000.

The SEC further contends, and the Court concluded on summary judgment, that Shinderman acted with scienter in making these misstatements and omissions, demonstrating intent to deceive

through his exclusive control over Markman Biologics' finances, systematic misappropriation of investor funds, repeated false filings with the SEC, and selective disclosure practices. As the sole executive officer with ultimate authority over Markman Biologics' offering materials and its bank accounts, Shinderman personally drafted or approved the false statements made to investors while simultaneously using the bank accounts to funnel their money to himself—in direct contradiction of his representations. He (1) made nearly monthly payments to himself, (2) violated his own written employment policies requiring prior written approval for expenses, (3) filed three separate Forms D with the SEC falsely claiming that investor assets would not be used to pay company executives (each time continuing to pay himself afterward), and (4) selectively disclosed the Quicksilver Action only to investors likely to discover it independently through their due diligence. When confronted under oath, Shinderman admitted the statements could be "misleading," that he had a "duty to investors to make honest representations," and that he should not have used investor funds for personal expenses, demonstrating his knowledge of wrongdoing.

As noted, the SEC contends, and will prove to the jury, that these misrepresentations were material because misuse of investor funds, undisclosed related party transactions, and concealment of a control person's fraud history are precisely the types of information reasonable investors consider important in making investment decisions. Multiple Markman Biologics investors testified they were unaware of these facts and would have considered them important in making their investment decisions. Further, the amount of funds that Shinderman misappropriated, particularly as a percentage of investors' funds, underscores the materiality of his misrepresentations. Shinderman misappropriated more than $600,000, representing over 40% of all funds raised from investors, an amount any reasonable investor would consider material or important. Shinderman may contend that he made personal loans to Markman Biologics, but he failed to provide evidence substantiating the vast majority of the purported loan amounts. Rather, the evidence shows that Shinderman *repaid* Markman Biologics approximately $159,000 of the funds he stole, less than a third of the total amount he misappropriated. Further, the evidence also shows that Shinderman did not refund most of these funds—$132,000—until *after* the SEC sued him in February 2023. The SEC contends that returning only a portion of the stolen investor funds (the majority after being sued) does not make his

misappropriation of over 40% of investor funds any less material or important to investors. Additionally, even if a fact finder were to offset the total amount of funds that Shinderman refunded or advanced to Markman Biologics against his misappropriation, it results in a net misappropriation of approximately $430,000, representing more than 30% of investor funds, a material amount. Notably, such offsetting is not the proper way to analyze the materiality of Shinderman's fraud because returning stolen funds does not make the theft any less material. But even this inappropriately lenient analysis favoring Shinderman still shows his misstatements were material.

**Fraudulent Scheme**

The SEC contends, and the Court found, that Shinderman engaged in a scheme to defraud investors. In particular, as the Court concluded on summary judgment, Shinderman (1) misrepresented his compensation and the Aspen related party transactions, (2) never amended or corrected the false offering materials, including private placement memoranda ("PPMs"), (3) never amended or corrected the false Forms D, (4) failed to disclose to investors the Quicksilver Action, and (5) used Markman Biologics' funds for his personal expenses. Shinderman engaged in conduct that did not have a principal legitimate purpose, but rather, had the principal purpose and effect of creating a false appearance of fact in furtherance of a scheme.

The SEC also contends, as the Court found, that Shinderman acted with the requisite scienter, as demonstrated by his (1) exclusive control over company finances, (2) systematic misappropriation of funds, and (3) repeated false and misleading statements made to investors and in filings with the SEC. Shinderman engaged in this scheme by means of interstate commerce, including by sending emails and mail, and by making telephone calls to investors.

The SEC further contends, and will prove to the jury, that Shinderman's scheme occurred "in connection with the purchase or sale" and "in the offer or sale" of Markman Biologics securities. Shinderman continuously and systematically diverted nearly half of all investor funds for his personal benefit, while at the same time he repeatedly disseminated false PPMs to investors and filed false Forms D with the SEC. His fraud directly coincided with the purchase and sale of Markman Biologics securities because the false statements were made in offering materials—including the PPMs— distributed to investors and prospective investors, and in securities forms filed with the SEC, which

were continuously available to investors and prospective investors. Investors received false PPMs and other offering materials in advance of, and in connection with, their decision to invest in Markman Biologics. Shinderman's fraud was integral to the entire securities offering process, as investors relied on these materially false offering materials when making their investment decisions. And his fraudulent scheme was further in connection with the offer and sale of Markman Biologics securities because he continually misappropriated investor funds as Shinderman solicited and investors provided new funds. The SEC intends to show that, in each year from 2019 through 2022, Shinderman misappropriated a material amount of investor funds while also continuing to raise funds from investors.[2] In the end, by using materially false and misleading offering materials, Shinderman raised approximately $1.4 million from 69 investors. Of that $1.4 million, Shinderman misappropriated more than $600,000, over 40% of those investors' funds. As with the materiality element above, Shinderman's claims that he repaid some funds fail to rebut the SEC's evidence. Shinderman's multi-year misappropriation scheme dwarfs the amount that he repaid and proves that even if some small amount of the money he diverted from Markman Biologics was his own, that amount, too, is dwarfed by the amounts he stole from Markman Biologics' investors.

**Contentions of Defendant Alan Shinderman**

Defendants' position is stated in other section[s] of this document; incorporated herein by reference; general denial to the above-stated SEC position is reserved and not waived.

**II.**

**Plaintiff's Statement on Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to Section 22(a) of the Securities Act and Sections 21(d), 21(e), and 27 of the Exchange Act.

Venue is proper in the United States District Court for the District of Nevada pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act because a substantial part of

---

[2] The SEC is not required to prove that a material amount was misappropriated in each year as long as it proves a material amount was misappropriated overall. Nevertheless, the SEC intends to prove ongoing material misappropriation to underscore that Shinderman's fraudulent scheme was in connection with the offer and sale of securities.

the events and omissions giving rise to the claims occurred in this District. Former Defendant Markman Biologics was a Nevada corporation throughout the relevant time period from November 2019 to June 2023. Markman Biologics was headquartered in this District from approximately December 2017 until at least mid-2021. Defendant Alan Shinderman resided in this District from at least December 2017 until at least mid-2021, and worked at Markman Biologics' Nevada headquarters during that time. Relief Defendant Aspen is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada during the relevant time period. Numerous Markman Biologics investors also reside in this District. In connection with the conduct alleged, Shinderman directly or indirectly made use of the means or instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange, including by sending emails and mail and by making telephone calls to investors.

**Defendants' Statement on Jurisdiction**

DEFENDANTS DO NOT CHALLENGE VENUE OR JURISDICTION.

**III.**

**PARTIES' POSITIONS ON FACTS THAT ARE ADMITTED AND REQUIRE NO PROOF**

**Plaintiff's Position on Admitted Facts:**

The SEC asserts that the facts set forth below, with citation to the Court's MSJ Opinion, were deemed admitted or undisputed by the Court as part of the MSJ Opinion and cannot now be disputed by Defendants. The SEC understands that Defendants nonetheless intend to contest these facts at trial. Should Defendants try to contest these facts at trial, the SEC intends to seek a corrective instruction from the Court and other relief as appropriate. Additionally, although these facts are admitted and require no proof, the SEC may present a small amount of testimony regarding them to provide context for the jury's understanding of testimony concerning disputed facts and issues.

**Background and Corporate Structure**

1. Markman Biologics was founded by Dr. Barry Markman and his wife, Judy Markman. MSJ. Op. at 2.

12

2. Markman Biologics held patents in microsurfacing skin graft technology during the relevant period. MSJ. Op. at 1.

3. Alan Shinderman founded Aspen in 1995 to provide corporate development services for public and private companies. MSJ Op. at 2.

4. Shinderman is the sole owner and operator of Aspen. DE 41 (Amended Answer) at 13.

5. From January 2019 until July 2023, Shinderman led Markman Biologics as its sole officer, holding the titles of president, secretary, treasurer, and director. MSJ Op. at 2.

**Employment and Compensation Agreements**

6. Shinderman drafted and executed an employment agreement, signing on behalf of both himself and Markman Biologics. MSJ Op. at 2.

7. The employment agreement set Shinderman's annual salary at $120,000 and became effective in 2019. MSJ Op. at 2.

10. No one else besides Shinderman negotiated or approved the employment agreement or his salary. MSJ Op. at 2.

11. Shinderman later amended the employment agreement in September 2022, increasing his salary to $132,000, which was approved by Markman Biologics' board of directors. MSJ Op. at 2.

**Agreements Between Markman Biologics and Aspen**

12. In December 2017, before he started working at Markman Biologics, Shinderman executed an agreement with Markman Biologics, signed by Dr. Markman, under which Aspen would provide services to help Markman Biologics with its initial public offering. MSJ Op. at 2.

13. In January 2019, Shinderman executed a commercial lease agreement, allowing Markman Biologics to rent space in Aspen's office by paying Aspen $1,000 per month in 2019 and 2020. MSJ Op. at 3.

14. Shinderman signed the commercial lease agreement on behalf of Markman Biologics and Aspen. MSJ Op. at 3.

**Securities Offerings and Investor Solicitation**

13

15. Between November 2019 and at least November 2022, Shinderman offered and sold Markman Biologics securities, including common stock, warrants, and promissory notes, to investors across the country. MSJ Op. at 3.

16. Shinderman personally solicited investors to purchase Markman Biologics securities and asked current investors to refer potential investors to him. MSJ Op. at 3.

17. Potential investors were provided a PPM, but they were not provided information concerning, or access to, Markman Biologics' financial statements.  MSJ Op. at 3.

**Private Placement Memoranda**

18. Shinderman drafted several sections of the PPM, including the state and federal disclaimer sections, based on his understanding from having "been around the business for a while." MSJ Op. at 4.

19. Shinderman approved the PPMs before they were provided to investors. MSJ Op. at 4.

20. As Markman Biologics' sole officer, Shinderman distributed the three undated PPMs directly to prospective investors and directed others within the company to do the same. MSJ Op. at 4.

21. Each of the three PPMs stated that "[a]s of this date no compensation has been paid" to executive officers. MSJ Op. at 4.

22. Shinderman admitted that this statement could be "misleading" and that, as an executive of Markman Biologics, he had a "duty to investors to make honest representations to them." MSJ Op. at 4.

23. The PPMs also stated that the board of directors "may determine and modify" executive officers' compensation "at any time in its discretion." MSJ Op. at 4.

24. The three PPMs included a section titled "Related Party Transactions," drafted and approved by Shinderman, that expressly stated that Markman Biologics had not entered into "any transaction since our incorporation," in which an officer or director, among others, "has any material interest, direct or indirect." MSJ Op. at 6.

25. The PPMs provided to investors stated that funds raised would be used for "general corporate and working capital purposes" and that Markman Biologics' management would

14

have "broad discretion in determining the use of the net proceeds" of the offering. MSJ Op. at 7.

**Forms D Filings**

26. Shinderman drafted, signed, and filed three Forms D with the SEC on May 12, 2020, January 4, 2021, and August 2021. MSJ Op. at 4.

27. Shinderman knew these forms would be publicly available to potential investors. MSJ Op. at 5.

28. Each Form D stated that no portion of the gross proceeds of the offering had been, or were proposed to be, used to pay any of the executive officers, directors, or promoters of Markman Biologics. MSJ Op. at 5.

29. Shinderman admitted during his deposition that each of the Forms D sections regarding officer compensation was inaccurate when filed. MSJ Op. at 5.

**Compensation and Payments to Shinderman**

30. During the entire period the three PPMs were disseminated to investors, Shinderman received a salary from Markman Biologics. MSJ Op. at 4.

31. Shinderman received more than $230,000 in salary between November 2019 and March 2022. MSJ Op. at 4.

32. At the time Shinderman filed the first Form D on May 12, 2020, he had already been paid at least $40,000 by Markman Biologics. MSJ Op. at 5.

33. Between May 13, 2020, and January 3, 2021, Shinderman was paid at least an additional $30,000. MSJ Op. at 5.

34. Between January 4 and August 25, 2021, Shinderman received at least another $50,000 of Markman Biologics' funds. MSJ Op. at 5.

35. After filing the final Form D on August 25, 2021, Shinderman continued to receive compensation from Markman Biologics. MSJ Op. at 5.

36. When asked whether shareholders were informed about his compensation, Shinderman stated, "I don't know how they would know." MSJ Op. at 5.

37. Shinderman told at least one prospective investor that he was not going to take "one dime" of investor funds for himself. MSJ Op. at 5.

**Investor Knowledge of Compensation**

38. Some investors were not aware that Shinderman received compensation from Markman Biologics. MSJ Op. at 5.

**Payments to Aspen**

39. Beginning in November 2019 and continuing until at least October 2021, Markman Biologics made over 39 payments to Aspen and Aspen's landlord, totaling more than $200,000, purportedly for office rent and services that Aspen provided Markman Biologics. MSJ Op. at 6.

40. In April 2021, Markman Biologics made four separate payments to Aspen totaling nearly $22,000. MSJ Op. at 6.

41. Investors would not know about the Aspen deals "unless they asked for [Markman Biologics'] financials." MSJ Op. at 6.

42. Several investors were not aware of any financial transactions between Markman Biologics and Aspen. MSJ Op. at 6.

**Personal Expenses Paid with Company Funds**

43. Shinderman used Markman Biologics' account to pay for his personal expenses, including car and auto insurance, personal travel, insurance, legal expenses, moving and storage, personal rent, personal debts, food and restaurants, and medical expenses. MSJ Op. at 7 (citing ECF Nos. 99-4 at 30, 91-92; 99-2 at 108-28; 99-35; 99-38; 99-39; 99-40; 99-41; 99-42).

44. Shinderman used Markman Biologics' investors funds to pay more than nine months of his $1,500 car payment, totaling over $13,000, as well as multiple months of car insurance. MSJ Op. at 7.

45. Shinderman used Markman Biologics assets to visit Illinois in September 2021, paying for his flights, Ubers, and multiple meals. MSJ Op. at 7.

46. Shinderman used Markman Biologics funds to cover four trips to Minnesota for his personal medical care, including paying for flights, hotels, meals, and ATM withdrawals. MSJ Op. at 7.

47. Shinderman admitted that the travel and medical costs were personal expenses, which he should not have used Markman Biologics funds to cover. MSJ Op. at 8.

48. On May 1, 2021, Markman Biologics had approximately $7,000 in cash. MSJ Op. at 8.

49. Over the course of May 2021, the company received $50,000 from investors, paid out numerous expenses for Shinderman's benefit, and was left with less than $12,000 in cash at the end of the month. MSJ Op. at 8.

50. On July 27, 2023, Shinderman resigned as president of Markman Biologics. MSJ Op. at 8.

**Prior SEC Enforcement Action**

51. In January 2018, the SEC filed a complaint against Shinderman and his company Quicksilver Stock Transfer LLC (Quicksilver), alleging that Shinderman committed securities fraud by misappropriating approximately $630,000 from a Quicksilver client. MSJ Op. at 8-9.

52. Without admitting or denying the SEC's allegations, Shinderman consented to a final judgment on July 26, 2019. MSJ Op. at 9.

53. The final judgment "permanently restrained and enjoined" Shinderman from violating Exchange Act Section 10(b), which prohibits fraud in connection with the purchase or sale of a security. MSJ Op. at 9.

**<u>Defendants' Position on Admitted Facts:</u>**

DEFENDANTS DO NOT AGREE THESE FACTS ARE ADMITTED.

**IV.**

**THE PARTIES POSITIONS ON FACTS, THAT THOUGH NOT ADMITTED, WILL NOT BE CONTESTED AT TRIAL BY EVIDENCE TO THE CONTRARY**

**Plaintiff's Position on Facts That Cannot Be Contested by Evidence to the Contrary**

Plaintiff SEC asserts that its numbered facts listed below cannot be contested by any properly admissible evidence because Defendants have not pointed to any evidence produced in discovery that would contest these facts. We nonetheless understand that Defendants will try to contest these facts.

Additionally, the SEC objects to Defendants' Position on Facts that Cannot Be Contested by Evidence to the Contrary (which are set forth in a separate section following the SEC's facts below). Defendants' position appears to be a series of contentions that are (a) contrary to findings and facts deemed admitted by the Court's MSJ Opinion; (b) have no basis in the record; and/or (c) are irrelevant to the two narrow questions for the jury concerning materiality and the "in connection with" elements of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. As described below, Defendants' appear intent to rely on many documents that were not produced in discovery in responsive to the SEC's document requests. A critical issue during discovery was Shinderman's failure to produce documents that he claimed existed. *See* ECF No. 65 (seeking a motion to compel based on Shinderman's reference in his June 13, 2024 deposition to his possession of certain categories of records responsive to the SEC requests). Ultimately, Shinderman submitted a declaration confirming that no such documents existed. ECF No. 90-1. If such documents do in fact exist, Shinderman cannot now use them at trial after having improperly withheld them from the SEC during discovery. The SEC therefore objects to nearly all of Defendants' proposed exhibits because they were not produced in discovery.

**Plaintiff Facts that Cannot Be Contested by Evidence to the Contrary:**

**Background and Corporate Structure**

1. After Shinderman became president of Markman Biologics, Dr. Markman no longer held an officer role at the company. DE 99-9 (January 1, 2017 Deposition of Judith Markman) at 136:6-16.

2. Instead, Dr. Markman served on its medical advisory board until October 2022, when he ceased to have any role with the company. DE 99-9 at 136:6-16.

**Employment and Compensation Agreements**

3. The employment agreement stated that Shinderman was "authorized, subject to the prior written approval of [Markman Biologics], to incur reasonable expenses for marketing, travel, legal, and similar items." DE 99-10 (Shinderman Employment Agreement) at § 4.4.

4. The employment agreement further stated that "Company shall reimburse [an] [e]mployee for all such authorized expenses in accordance with the guidelines[] set forth by the Internal Revenue Service." DE 99-10 at § 4.4.

5. Shinderman was not aware of the IRS guidelines referenced in his employment agreement, did no research concerning those guidelines, and was not aware of whether he received reimbursements in accordance with those guidelines. DE 99-2 at 159:13-160:7.

6. Shinderman did not obtain written approval for his personal expenses as required by his employment agreement. DE 99-2 (June 13, 2024 Deposition of Alan Shinderman) at 151:13-155:16; DE 99-47 (Shinderman's Response to the SEC's Third Set of Requests for the Production of Documents) at SEC-ShindermanA-E-0000043.

7. Shinderman also received one million shares of Markman Biologics. August 10, 2022 Investigative Testimony of Alan Shinderman at 73:6-10 ("I was given a million shares of Markman . . . ."); Plaintiff's Exhibit 7 (reflecting 600,000 shares of Markman Biologics owned by Shinderman).

**Agreements Between Markman Biologics and Aspen**

8. Pursuant to the December 2017 agreement, Dr. Barry and Judy Markman paid Aspen $50,000, the total amount due to Aspen under the agreement. August 10, 2022 Testimony of Alan Shinderman at 132:6-139:3 and Testimony Ex. 16, SEC-MARKMANB-E-00000001.

9. There was no formal delineation or structure setting forth when and how Shinderman was (a) working for Markman Biologics as president versus (b) working for Markman Biologics through Aspen. DE 99-2 at 187:12-190:4.

**Securities Offerings and Investor Solicitation**

19

10. Some of the investors were unsophisticated, and at least one investor had never purchased stock before. DE 99-2 at 72:15-21, 74:14-76:15; DE 99-20 (List of Markman Biologic's Shareholders); DE 99-18 (April 16, 2024 Deposition of Davrick Liles) at 22:17-23:11.

11. During Shinderman's tenure, Markman Biologics ultimately raised more than $1,426,200 from 69 investors located across the country. DE 99-4 (August 10, 2022 Testimony of Alan Shinderman) at 69:4-6; DE-48 (Declaration of Jeffrey B. Anderson) at ¶ 7.

**Private Placement Memoranda**

12. By November 2019, Shinderman and Dr. Markman had begun drafting the first of three PPMs. DR_BARRY_MARKMAN_SUBPOENA_018692 (Nov. 2019); MSJ Op. at 4 (Jan. 2020).

13. Shinderman continued to provide potential investors with these PPMs through at least June 2022. Markman_0012507-08; Markman_0012509-590.

**Personal Expenses Paid with Company Funds**

14. Shinderman used at least $137,000 of investor funds in Markman Biologics' account to pay for his personal expenses, including car and auto insurance, personal travel, insurance, legal expenses, moving and storage, personal rent, personal debts, food and restaurants, and medical expenses, as well as unexplained cash withdrawals. Exhibit 32.

15. Plaintiff's Exhibit 32, to be introduced at trial, accurately shows a summary of these items, which is also reproduced below:

| Category | Amount |
|---|---|
| Cash withdrawals from ATMs (no apparent business purpose) | $32,805 |
| Travel (Uber, airlines, car rental, parking) | $46,589 |
| Food and beverage expenses (approx. 140 payments to McDonald's, Panda Express, Shake Shack, etc.) | $19,078 |
| Automobile expenses (GM Financial for Cadillac Escalade, Geico insurance, gas stations) | $14,787 |
| Medical expenses | $7,938 |
| Moving and storage expenses | $5,892 |
| Debts | $3,840 |
| Residential Rent | $3,797 |
| Legal services | $2,632 |
| **TOTAL** | **$137,357** |

16. In total, more than $600,000 from Markman Biologics' bank accounts was used for Shinderman's personal benefit. DE 99-48 ¶ 11; MSJ Op. at 8. The following table, reflects the three categories of Shinderman's misappropriation:

| Salary | $230,376 |
|---|---|
| Related Party Payments | $233,024 |
| Personal Expenses (including $31,187 in cash withdrawals) | $137,357 |

Plaintiff's Exhibit 31.

**Markman Biologics' Financial Status**

17. On July 27, 2023, Shinderman resigned as president of Markman Biologics. MSJ Op. at 8.

18. As of April 2024, Markman Biologics had generated minimal revenue and owed approximately $90,000 to the McGuire Group for a dental study related to Markman Biologics' technology.  April 9, 2024 Deposition of Jay Drake ("Drake Depo Tr.") at t 32:16-33:7; 86:7-86:24 90:18-91:6.

19. Without payment of the outstanding $90,000, the study could not be completed and its results, which could demonstrate the effectiveness of the company's technology, could not be published. Drake Depo Tr. at 32:23-33:7; 89:8-91:6.

20. As of April 2024, Markman Biologics had no funds remaining. Drake Depo. Tr. 90:18-91:6.

**Defendants' Position on Facts That Cannot Be Contested by Evidence to the Contrary**

DEFENDANTS' POSITION:  Defendants respectfully lodge general objection to the myriad of incomplete and misleading out of context purported unassailable facts posited directly above by the SEC.  There are too many to address individually.   In no particular order, Defendants must lodge specific objection to the notion that Dr. Barry Markman ceased meaningful involvement in MBC's affaires when he gave all his stock to his wife and brought Mr. Shinderman in to serve as CEO, etc.  Further, the SEC's attempt to clothe its hyperbolic dollar figure, currently adjusted down to $139,127, for purported personal expenses is objected to.   This is not an exhaustive list of

Defendants' objections and all rights are respectfully reserved.

CONTENTIONS OF DEFENDANTS

Defendants deny and contest the materiality of the submissions to the SEC and contained in any Form D, S-1 or PPM. Defendants deny that the expenditures made from MBC cross any threshold of materiality as the SEC suggests to this Court. For that matter, the Defendants deny that any outlay made under Shinderman's watch crosses over into impropriety. The two subsets of facts are interrelated as to whether or not they can rise to the level of materiality. Defendants contend that no investor suffered any financial loss through his/her/their acquisition of MBC shares.

With the exception of materiality, the Court has already ruled on the status of the statements made in the SEC filings and the PPM's. Defendants reserve the right to introduce testimony, evidence and argument concerning same when it is relevant to materiality. The Defendants contend that the operating account of MBC was not comprised exclusively of funds raised from investors. The ham-handed and unsupported characterization by the SEC of the significant amounts loaned by Mr. Shinderman to MBC to keep that company operating as being done in some half-baked scheme likened to that of a bank robber returning back to the bank to return the loot are disputed and flatly rejected by the Defendants, for the record. The SEC admits that these loans commenced BEFORE the SEC came around. These loans had and have the approval of MBC's Board of Directors. The MBC asset comprised of the receiveable[s] from the Osteogenics worldwide exclusive licensing agreement for dental and oral surgery product was pledged by MBC as security [i.e. collateral] for these loans. In sum, the SEC's fantastical characterization of these loans will fail when placed beside the true facts of these hard-money transfers that kept MBC afloat at a critical time.

Using the year 2021 as an example, Defendants will show through a prepared summary exhibit [DEX 26] that MBC issued 18 separate 1099's for 2021 to employees, vendors, consultants, attorneys, accountants and the like. These outlays totaled over $336,000.00. 1099'd Compensation to Mr. Shinderman in that year was only $66,900 which was approximately 20% of the total; in that year, MBC paid over $92,000 to The McGuire Institute for product

22

studies/development, which was 27% of the total outlays.

For simplicity, Defendants will attempt to compartmentalize some of the major categories of outlays with which the SEC purportedly takes exception. In any and all cases, where appropriate, Shinderman instructed MBC's bookkeeper to record certain outlays as income paid to him in recognition of any instance when MBC funds were used as a convenience or out of necessity as the case may be. Defendants take the position that the payments styled as salary, rent, fees to Aspen and the like were reasonable compensation at or below market-rate[s] in return for services and other valuable consideration[s] rendered and that presumptive title to such payments has attached.

CATEGORY 1 – SALARY TO ALAN SHINDERMAN. The agreement for MBC to pay Mr. Shinderman an annual salary of $120,000 which was later increased a modest amount is a major component of the SEC's case. To summarize, the Defendants contend that the amount is reasonable, that no reasonable investor would properly begrudge a hands-on President/CEO of a bio-med company with MBC's IP assets and potential a low six-figure salary. As Judge Gordon wisely recognized already, it is the very rare reasonable investor that would expect a company to not compensate its officers. Judge Gordon wrote: "Reasonable investors understand employees do not usually work for free, especially when those employees are not founders of the company." ECF No. 113, page 17, lines 18-20.

It is simply a mathematical and historical fact that MBC has not and did not pay Mr. Shinderman his agreed salary in full. Although it might sound preposterous in this 21st century to the casual observer, Defendants must lodge their position and legal argument that it would violate Amendment XIII and other law[s] if the SEC were to be successful in their position that Mr. Shinderman is somehow to be retroactively rendered an involuntary servant for no pay, which is what the SEC would have this Court do. Defendants contend that no investor suffered any financial loss due to Shinderman's salary through his/her/their acquisition of MBC shares. Defendants contend that any inter-relation between compensation or salary paid to officer/employees of MBC is incidental to and not directly entwined with the purchase or sale of any security. Lastly, Defendants reserve all rights to have the salary paid to Shinderman that

predated any public filing or statement to any investors that would give rise to any "discrepancy" [to use Judge Gordin's term] treated differently than those funds paid afterwards

CATEGORY 2 – OFFICE RENT PAID TO ASPEN OR TO THE LAS VEGAS LANDLORD

The agreement for MBC to pay for its office suite within the larger suite of offices in Festival Plaza in Las Vegas, Nevada is also a significant component of the SEC's complaint. As Judge Gordon wisely recognized already: "reasonable investors understand companies need office space and assistance going public and there is no evidence that Markman Biologics paid above fair market value for Aspen's services." ECF No. 113, page 18, lines 6-7, there is no assertion made that the rent was out of the norm. Defendants contend that the entirety of rent paid by MBC for its benefit should be "moved" from the challenged ledger and be regrouped properly with the myriad of unchallenged [because they are not challengeable] expenditures Mr. Shinderman regularly paid-out for MBC's benefit such as payments to consultants, to IP lawyers, to various academic and medical institutions for clinical trials of MBC's patented products and the like. Lastly, Defendants reserve all rights to have the rental paid to Aspen that predated any public filing or statement to any investors that would give rise to any "discrepancy" [to use Judge Gordin's term] treated differently than those fees paid afterwards.

CATEGORY 3 – PAYMENTS TO ASPEN FOR TAKING MBC PUBLIC

One particular factual dispute regarding the genesis and the timing of the start of the consultant-client relationship between Aspen and MBC must be again brought out in the open, lest any waiver be imputed to the Defendants. That is, the agreement for the initial $50,000 fee arrangement was struck and executed in January of 2018 and NOT IN DECEMBER OF 2017. The federal tax return of MBC for 2018 seems to go along with the fiction of it being done in 2017, but the Defendants make the record herein that they will present evidence, testimony and argument at trial that the contract came into being in 2018 and not in 2017. Despite what month the agreement started, the Defendants will present evidence, testimony and argument at trial that the scope of the services for said agreement expanded exponentially when Dr. Markman [or perhaps his wife] decided to pursue the more complex and harder goal of having MBC listed on

the NASDAQ Exchange; this type of listing involved a significant increase in the amount of work necessary for Aspen to perform above and beyond the scope of work involved to have MBC "go public" via the so-called "Pink-Sheets." Again, as Judge Gordon wisely recognized already: "reasonable investors understand companies need office space and assistance going public and there is no evidence that Markman Biologics paid above fair market value for Aspen's services." ECF No. 113, page 18, lines 6-7. Defendants contend that no investor suffered any financial loss due to the fees paid to Aspen necessary in pursuit of taking MBC public through his/her/their acquisition of MBC shares. Defendants contend that any inter-relation between fees paid to Aspen for these necessary services for MBC is incidental to and not directly entwined with the purchase or sale of any security. Lastly, Defendants reserve all rights to have the fees paid to Aspen that predated any public filing or statement to any investors that would give rise to any "discrepancy" [to use Judge Gordon's term] treated differently than those fees paid afterwards.

CATEGORY 4 – PAYMENTS THE SEC CLAIMS WERE FOR SHINDERMAN PERSONALLY

It is Defendants' position that each and every such expenditure that the SEC complains of and wants to point towards as evidence of misappropriation or worse was properly addressed internally by MBC's bookkeeper. Whether booked as proper business expenses or booked as income paid to Mr. Shinderman, they were addressed properly by MBC and Shinderman. At this point in time, the SEC cannot make a prima facie case of misappropriation by merely pointing to a total gleaned from bank statement[s] and claiming it sees no legitimate business purpose for any sub-category. The mathematical total is probably correct as adding up numbers is rudimentary and checkable. The problem lies with the SEC's inability to show where the proverbial bean-counter had any ability to properly categorize any single expense as legitimate or not legitimate. To the extent the SEC is trying to bootstrap its clearly inadequate previous purported expert report that did nothing but add up general categories of expenses based only on what was spent and to who it was paid [as opposed to what it was actually for], Defendants lodge a general and hopefully standing objection that the SEC is attempting to inject irrelevant, immaterial, or unduly repetitious evidence through Jeffrey Anderson's Declaration, which might be ECF No. 99-48. While it may

not be precisely on-point, consider: Section 7(c), 5 U.S.C. § 556 (d), states in pertinent part:

"Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof. Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of *irrelevant, immaterial, or unduly repetitious evidence.* A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and *in accordance with* the reliable, probative, and *substantial evidence.*"

(Emphasis added.)

The SEC has come to this Court to accuse Defendants in its pleadings of making foul and dishonest expenditures. The words used by the SEC include "misappropriating"[3] Extensive discovery has ensued.  It is not too much to expect more than a mere summary that disclaims any conclusion of impropriety by that purported expert and states damningly for the SEC that the knowledge [dare we assume: facts] that any expense was improper is held by others.

I.     There is no specific accusation of any particular expense in this or any sub-set being improper; rather, there is an assumption implied, but nothing more.  MBC regularly spent money just like any operating business in a similar situation would. Defendants will hold the SEC to its burdens [proof, production, persuasion] at trial and will lodge objection[s] here and now as well as at the appropriate time in trial to prevent the SEC from improperly shifting any burden[s] onto Defendants regarding any expense made by the Company. This is not an IRS case; the civil burden of proof, etc. lies with the SEC.

Without waiving any objection[s], it is Defendants' position that each and every such expenditure that the SEC appears poised to complain of and wants to point towards as evidence of misappropriation or worse was properly addressed internally by MBC's bookkeeper. The purported expert accounting definitely DOES NOT accuse Defendants of impropriety and

---

[3] https://www.sec.gov/enforcement-litigation/litigation-releases/lr-25649 and ECF No. 1 Paras. 6, 8, 28.

specifically states by way of a disclaimer that the purported expert is NOT weighing-in on any single expense item being improper, rather it states that the expert assumes the lawyer for the SEC possesses the missing facts that would establish impropriety.  As the SEC has yet to provide those necessary and still missing purported facts, Defendants reserve all rights on this issue.[4] In all candor, a purported expert report that is only a mathematical calculation of where money was spent and that specifically DISCLAIMS in a footnote to render any type opinion on any expense's propriety or lack of propriety is worthless and subject to being stricken and excluded from this proceeding. The SEC can't simply share a dollar figure with the jury and suggest, without more, that they should adopt the SEC's belief that $139k was misappropriated.

<u>THE ATM WITHDRAWALS DID NOT BENEFIT DEFENDANTS</u>

The ATM withdrawals that were made with regularity on Fridays at a Bank of America branch in Summerlin, Nevada were nothing more than cash outlays to office assistants Arielle Serano and Destiny Curameng who preferred to receive their compensation in cash; Mr. Shinderman would issue a paycheck out of MBC operating account for the payment to either Ms. Serano or Ms. Curameng which was never negotiated through any bank; instead, MBC would retain possession of the draft and then the amount would be withdrawn from an ATM by Mr. Shinderman and handed to the employee.  There was no instance of MBC ever being caused to pay double the proper amount as the aforementioned checks were never negotiated. [see, e.g. Exhibit 4, 5/1/24, Depo. of Ms. Curameng]. This was a common practice that was not exclusive to staff for MBC. The claim by the SEC of <u>*"no apparent business purpose"*</u> is easily dispelled by the facts of the matter as it will be Defendants' evidence, testimony and argument at trial that these ATM withdrawals were an accommodation for the necessary and proper business purpose of employee payroll.  The pay for Ms. Curameng in the year 2021 [$6,386.00] is reflected in the 1099 issued to her; see **Defendants' Exhibit 26**.

<u>THE INSURANCE POLICIES FOR MBC SOLD TO THE COMPNMAY BY DR.</u>

---

[4] Whatever anecdotal passages from discovery that might on their face touch on very few individual expenditures, there is nothing in the record that would come close to supporting the SEC's multiple sub-categories that  purportedly add-up to their $139k claim.

MARKMAN'S FATHER DID NOT BENEFIT THE DEFENDANTS BUT DID OF COURSE BENEFIT THE COMPANY

The multitude of outlays to insurance broker Marsh & McClennan and related companies were not expenses that benefitted Mr. Shinderman or Aspen in any way. The company needed and sought the protection of several policies of insurance and, at the specific instruction of Dr. Barry Markman, Alan Shinderman obtained these several business insurance policies through insurance broker Murray Markman, who is in fact the father of Dr. Markman and the father-in-law of Judith Markman, the single-largest shareholder of MBC for most of its existence. These insurance costs came close to $30,000.00 in total. At trial, Defendants will present evidence, testimony and argument that these payments funneled through the insurance brokerage that was owned and controlled by the Markman's immediate family enriched the Markman family and did not benefit Aspen or Mr. Shinderman. On the belief that the SEC is confusing and conflating all or some of the insurance outlays and sees them as improper expenses for Mr. Shinderman's personal insurance or medical expenses, Defendants hereby inform all of the role played by insurance broker Murray Markman and reserve all rights.

In its draft submittal for the PRE-TRIAL ORDER, the SEC submits multiple categories it claims were personal expenses; Defendants will address several of those claims below, in no particular order:

AUTOMOBILE EXPENSE [GMAC Financial]

Approximately seven [7] ACH-based or autopay payments were made to GMAC Financing for Shinderman's vehicle [a Cadillac Escalade] out of the MBC operating account. It was an error that the MBC operating account was designated to make the monthly payments for this vehicle even though Mr. Shinderman used this vehicle to conduct MBC's business regularly. After the error was discovered, which was before MBC came under the scrutiny of the SEC in this matter, Shinderman and MBC's contracted CPA Rachel Boules took timely steps to adjust the books and change the expense to that of income paid to Shinderman in full acknowledgement that it is not a valid company expense to make the payments for Mr. Shinderman's vehicle and that the expenditures would and should be booked as taxable income to Shinderman. This was discussed

by Ms. Boule in her deposition in this matter.  Thus, the gross amount erroneously disbursed to GMAC Financing and later properly booked by the CPA as income to Mr. Shinderman did indeed increase the expense line-item for Mr. Shinderman's salary, but this particular credit/debit adjusted categorizing did not cover the shortfall mentioned elsewhere represented by MBC not paying Mr. Shinderman his full salary of $10,000 per month [$120,000.00 per annum].

Moving and Storage Expenses    $5,892 claimed by the SEC

There is no specific accusation of any particular expense in this sub-set being improper; rather, there is an assumption implied, but nothing more.  It is simply a fact that MBC did move its offices from Las Vegas, Nevada to Frisco, Texas in the time interval where Shinderman was the CEO; reasonable minds can assume that MBC spent funds to accomplish this interstate move. It is a fact not in dispute that Dr. and Mrs. Markman resided and still reside in Frisco, TX. Defendants will hold the SEC to its burdens [proof, production, persuasion] at trial and will lodge objection[s] here and now as well as at the appropriate time in trial to prevent the SEC from improperly shifting any burden[s] onto Defendants regarding any expense made by the Company.

Residential Rent

In the Spring of 2021, Dr. Markman and Mr. Shinderman were in Frisco, TX, where Dr. and Mrs. Markman already resided, to look at apartments for Mr. Shinderman who was intending to move his residence and the office of MBC to Frisco, TX with the Markmans' blessing.  An acceptable apartment was found and it required the immediate payment of a deposit to secure the lease.  At that time, the only check Mr. Shinderman had available was a check from MBC's account; with Dr. Markman's full knowledge and acquiescence because he was literally standing next to Mr. Shinderman at that moment, a deposit of several thousand dollars was issued to the landlord to secure the residence lease; subsequently, this outlay was booked as a disbursement of income to Shinderman and was included in Shinderman's 1099 tax form. There is no specific accusation of any particular expense in this sub-set being improper; rather, there is an assumption implied, but nothing more.  Defendants will hold the SEC to its burdens [proof, production, persuasion] at trial and will lodge objection[s] here and now as well as at the appropriate time in trial to prevent the SEC from improperly shifting any burden[s] onto Defendants regarding any

expense made by the Company.

TRAVEL $48,000 approx. claimed by SEC

There is no specific accusation of any particular expense in this sub-set being improper; rather, there is an assumption implied, but nothing more. MBC regularly deployed people to take business trips for the benefit of MBC; MBC regularly spent funds with airlines, hotels, meals and the like. Defendants will hold the SEC to its burdens [proof, production, persuasion] at trial and will lodge objection[s] here and now as well as at the appropriate time in trial to prevent the SEC from improperly shifting any burden[s] onto Defendants regarding any expense made by the Company.

Over the three-year span on this line item, Mr. Shinderman and Dr. Markman traveled domestically and internationally several times to promote MBC. The international trip was to Hong Kong via South Korea and on that trip, Mr. Shinderman traveled further from Hong Kong to Shanghai, while Dr. Markman decided mid-trip to return to the US from Hong Kong and not to go onward to Shanghai; the MBC debit card with the Bank of America was used for this business trip, including the changes required and re-ticketing, etc. caused by Dr. Markman's decision to go home early. This travel was a proper business expense of MBC. The other use of the business account for "Uber, airlines, car rental parking" in that three-year period are similarly business travel made by Shinderman and Dr. Markman, which included travel to Denver, Colorado for a presentation promoting MBC to a potential distribution partner, travel to Los Angeles, California for a presentation to an owner of several hospitals that were potential customers of MBC's micro-surface medical products, to Phoenix, Arizona once for meetings with one of MBC's manufacturers, to Florida for a medical convention[5], to San Antonio, Texas twice for meetings with another of MBC's manufacturers, and there may have been others that Mr. Shinderman and Dr. Markman went on together.

Shinderman also made approximately ten (10) or so other business trips by himself or with other sales-related people with MBC. These business trips included Coronado, CA, Dallas, TX,

---

[5] Dr. Donykian, a board member of MBC also went on this business trip at MBC's expense.

Rochester, MN, and Las Vegas, NV, among others.  These trips involved airfare, lodging, meals and car rental fees [and more] that were reasonable and in-line with standard business practices.

DEBTS    $3,840.00         Unknown what this is purportedly based on.

There is no specific accusation of any particular expense in this sub-set being improper; rather, there is an assumption implied, but nothing more.  MBC regularly spent money on sundry things to promote its business. Defendants will hold the SEC to its burdens [proof, production, persuasion] at trial and will lodge objection[s] here and now as well as at the appropriate time in trial to prevent the SEC from improperly shifting any burden[s] onto Defendants regarding any expense made by the Company. It is possible the SEC is referring to all or part of a November 2019 payment or some other from MBC to Shinderman that was a partial repayment of a prior loan Mr. Shinderman made to MBC.

RETAIL SHOPPING     $1,737 claimed by SEC - April 2020 Feb. 2023

There is no specific accusation of any particular expense in this sub-set being improper; rather, there is an assumption implied, but nothing more.  MBC regularly purchased necessary things to run its business; MBC regularly spent funds with retail businesses for same.  Defendants will hold the SEC to its burdens [proof, production, persuasion] at trial and will lodge objection[s] here and now as well as at the appropriate time in trial to prevent the SEC from improperly shifting any burden[s] onto Defendants regarding any expense made by the Company.  Without waiving any objection[s], the Company, for example, purchased two microscopes through Amazon.com to use in industry presentations marketing MBC's products. Even if the SEC's position is borne out at trial and the SEC can prove [as it must] that these retail expenditures were not for legitimate company business and also prove that the expenses were not retroactively 'caught' by the bookkeeper and adjusted in the ledger[s] to characterize them as income to an officer, the sum total stated of $1,737 spanning a 34-month interval averages out to $51 per month.

**V.**

The following are the issues of fact to be tried and determined at trial:

31

**Plaintiff's Statement on the issues of fact to be tried and determined at trial.**

1.  Whether Shinderman's misrepresentations or omissions concerning (a) his use of investor proceeds and/or (b) his prior SEC Enforcement Action were material.

2.  Whether Shinderman's scheme to defraud investors was in connection with the purchase or sale of a security.

Further, the SEC objects to Defendants' counter-statement of the issues of fact (below) because it misstates the materiality and "in connection with" elements of a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**Defendants' counter-statement of the issues of fact**

(1) whether the totality of the circumstances surrounding the data and information submitted to investors that the Court has characterized as "discrepancies" rise objectively to the level of materiality as defined by the 9th Circuit and/or SCOTUS; and (2) whether the actions of MBC in paying its CEO a salary, paying rent for its offices, paying Aspen for corporate services, and paying other outlays while being led by Mr. Shinderman was exclusively in connection with funds directly linked to the purchase or sale of a security.

**VI.**

The following are the issues of law to be to be tried and determined at trial:

**Plaintiff's Statement on the issues of law to be tried and determined at trial.**

None.

**Defendants' Statement on the issues of fact to be tried and determined at trial.**

The issues are set forth in ECF No. 113 by the Court.

**VII.**

**Parties' Joint Statement on Exhibits**

The parties participated in a telephonic meet and confer on April 21, 2026. Defendants agreed to stipulate to some of the SEC's exhibits as reflected in Appendix A. During the meet and confer, the SEC explained the bases as to why it would not stipulate to any of Defendants' proposed exhibits at this time.

**Plaintiff's Statement on Exhibits, Electronic Evidence, and Depositions**

Plaintiff's specific objections to Defendants' proposed exhibits are noted in Appendix B. With one exception, none of Defendants' proposed exhibits were identified in his initial disclosures. Nearly all of these exhibits were not produced in discovery despite being responsive to one or more of the SEC's requests of production. By failing to produce these documents in discovery, Defendant has denied the SEC an opportunity to probe the relevance, source, authenticity, and accuracy of these exhibits. Accordingly, Defendant should be precluded from using them at trial and the SEC will likely submit motions in limine to exclude these exhibits.

Further, many of these exhibits are PDF files that combine multiple, separate documents. This format make it unnecessarily difficult to identify, cite, and evaluate individual exhibits. To promote clarity and efficiency, the SEC has requested that Defendant resubmit its exhibits as separately labeled documents, or produce them in a format that clearer delineates and bookmarks each individual exhibit within a combined PDF.

On April 24, 2026, Defendants produced and identified as exhibits seven full transcripts of depositions taken during discovery in this matter. The SEC objects to the use of these deposition transcripts because Defendants failed to identify their deposition designations in a timely manner and because they failed to identify which specific portions of the transcripts they intend to use and the basis for their use. The SEC also reserves its right to object to specific portions of deposition transcripts on relevance and all other applicable grounds.

(a) Attached as **Appendix A** is a table of the SEC's exhibits. Attached as **Appendix B** is a table of Defendants exhibits.

(b) Electronic evidence: [State whether the parties intend to present electronic evidence for purposes of jury deliberation]

The SEC does not at this time intend to present electronic evidence for the purpose of jury deliberation.

(c) Depositions

33

(1) Plaintiff will offer the following depositions: none.[6]

Defendant will offer the following depositions:  See APPENDIX B; use at trial for impeachment and refreshing recollection is reserved; and Defendants adopt the reservation denoted by the SEC in the footnote #8.

(d) Objections to depositions  See APPENDIX B.

## VIII.

### Plaintiff's Statement on Witnesses

The SEC notes that most of the witnesses the Defendants propose to call (listed below) were not listed on their Rule 26 disclosures, and that the list includes two SEC employees. The SEC will likely be filing motions in limine to preclude Defendants from calling many of their listed witnesses.

The following witnesses may be called by the parties at trial

(a) Plaintiff's witnesses[7]

1. Eugene "Jack" Walton Atkinson, Jr. (Plano, Texas)

2. Jay M. Drake (Pickins, Mississippi)

3. Dr. Barry Markman (Frisco, Texas)

4. Fernando A. Martinez (Richardson, Texas)

5. Alan Shinderman (Frisco, Texas)

6. John Alexander Zotos (Houston, Texas)

7. Samuel Spare (Summary Witness) (Denver, Colorado)

(b) Defendants' witnesses

---

[6] In the unexpected event that a witness listed below in Section VIII becomes unavailable for trial, the SEC reserves the right to introduce relevant portions of their deposition in lieu of their in-person testimony. The SEC will promptly alert the Defendant and the Court should that unexpected circumstance arise. Defendants also reserve these rights.

[7] Addresses are omitted for privacy reasons, but have been provided to the Defendant.

1. Judy Markman (Frisco, Texas)

2. Barry Markman (Frisco, Texas)

3. Murray Markman (Boca Raton, Florida)

4. Kyle Tingle (Las Vegas. Nevada)

5. Robin Voorhees (Somerset, New Jersey)

6. Kathy Duncan (Richmond, Texas)

7. Kathryn Davis (Flower Mound, Texas)

8. Jeffrey Wertz (Cannonsburg, PA)

9. Jeff Olyan (Dallas, Texas)

10. Chase McConville (Dallas, Texas)

11. Arielle Serano (Las Vegas, Nevada)

12. Xavier Zotos (Houston, Texas)

13. John Alexander Zotos (Houston, Texas)

14. Jay Michael Drake (Mississippi)

15. Shane Shuttleworth (Lubbock, Texas)

16. Jessica Jarvis (Las Vegas, Nevada)

17. Eugene Jack Walton (Plano, Texas)

18. Fernando A. Martinez (Frisco, Texas)

19. Samuel Spare (Denver, Colorado)

20. Dunato Furlano New York, NY

21. Larry Horwitz (Lake Forest, California)

22. Jessica Locket (Lake Forest, California)

23. Don Searle (California)

24. Mardik Donykian (New Jersey)

25. Spencer Flores (Dallas, Texas)

26. Brian Bloom (Dallas, Texas)

27. Bank of America

28. Davryk Liles  (Las Vegas, NV)

35

29. Kathy Wheat (Ney York, NY)

30. Jeffrey Anderson (Washington, DC)

31. Barney Ales  (Las Vegas, NV)

DEFENDANTS' INITIAL EXHIBIT LIST IS ATTACHED AS **APPENDIX B**

PLAINTIFF SEC'S LOG OF OBJECTIONS TO DEFENDANTS' PROFFERED TRIAL EXHIBITS IS ATTACHED AS APPENDIX _____

A JOINTLY-PRODUCED LOG OF NON-OBJECTIONABLE EXHIBITS FROM ALL PARTIES THAT ARE TO BE ADMITTED ON STIPULATION AT TRIAL IS ATTACHED AS APPENDIX _____ [8]

DEFENDANTS' DESIGNATION OF DEPOSITION TESTIMONY PRESERVED FOR USE AT TRIAL IS FILED HEREWITH AS APPENDIX B.

**IX.**

**Plaintiff's Statement on Trial Dates**

The SEC and Defendants' have significantly different views as the anticipated length of a trial. The SEC believes that the presentation of its case will require 3-5 days. Defendants have stated that they believe the trial will take no less than 10 to 12 days. As stated above, the SEC anticipates filing motions in limine to preclude Defendants from calling many of their listed witnesses, which would substantially reduce the length of time needed for a trial. Additionally, given the disparate views of the parties as to what this trial will entail, the SEC intends to request a pretrial conference pursuant to Local Rule 16-2.

The Parties are jointly available to start the trial the weeks of February 8, 15 or 22, 2027.

Additionally, the SEC is available for a trial for the following weeks:

1. November 16, 2026 through November 20, 2026.

2. November 30, 2026 through December 4, 2026.

---

[8] The SEC's position is that no such log ever existed, but that certain of the SEC's exhibits listed in Appendix A are noted as having been stipulated as admissible by Defendants.

36

Despite repeated requests from the SEC to find more trial dates, Defendants have indicated that they are not available for a trial until 2027.

**Defendants' Statement on Trial Dates**

Mr. Shinderman has informed the SEC that he is available for trial setting for the entirety of January and February of 2027. Mr. Shinderman has not agreed to the trail settings stated by the SEC outside of January or February of 2027.

**X.**

**Parties' Statement on Meet and Confer Requirement**

The parties agree that prior to filing any motion with the Court, they shall initiate a meet and confer in a good-faith effort to resolve or narrow the dispute at issue. The meet and confer shall occur no later than five (5) business days before the anticipated filing date of any such motion, unless exigent circumstances require earlier filing. The meet and confer may be conducted telephonically, by videoconference, or in person.

**XI.**

**Parties' Request for a Pretrial Conference**

The parties intend to jointly submit a motion respectfully requesting that the Court schedule pretrial conference pursuant to Local Rule 16-2 prior to the commencement of trial. The parties respectfully submit that a pretrial conference would be appropriate and beneficial in this matter for the following reasons: (1) the parties hold materially and significantly different views regarding the scope of the issues to be presented at trial; (2) the parties dispute what facts, if any, were established as a matter of law by the Court's summary judgment ruling and are therefore not subject to relitigation at trial; and (3) the parties have substantial disagreements regarding the admissibility and appropriateness of certain documents, exhibits, and witnesses each party intends to present at trial. The parties believe that a pretrial conference would assist the Court and the parties in narrowing and clarifying the triable issues, streamlining the presentation of evidence, and

37

promoting the efficient and orderly conduct of trial.

APPROVED AS TO FORM AND CONTENT:

Dated April 28, 2026
By:/s/ *Alan Shinderman*
Alan Shinderman
3101 Gaylord Pkwy 1101
Frisco, TX 75034

By:/s/ *Edward J. Reilly*
Edward J. Reilly. Esq.
Ada Fernandez Johnson, Esq.
Katherine H. Stella, Esq.
Derek Bentsen
100 F Street, NE Washington, DC 20549
*Attorneys for Plaintiff Securities and Exchange Commission*

IT IS ORDERED that this case is set for Jury Trial on the stacked calendar on February 8, 2027, at 8:30 a.m. in Courtroom 6C. Calendar Call is set for February 2, 2027, at 9:00 a.m. in Courtroom 6C.

IT IS SO ORDERED:

Dated:___April 30, 2026___

_____
ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE

38